# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| ATLANTIC HOLDINGS LIMITED, | : | |
|---|---|---|
| Plaintiff, | : | |
| | : | CIVIL ACTION |
| v. | : | |
| APOLLO METALS, LTD., et al., | : | |
| | : | NO. 16-6247 |
| Defendants. | : | |

## M E M O R A N D U M

STENGEL, C.J.                                                               December 11, 2017

## I. INTRODUCTION

This is a groundwater contamination dispute between neighboring owners of industrial properties in Bethlehem, Pa. The plaintiff, Atlantic Holdings Limited, filed claims against the defendants, Apollo Metals, Ltd. and Apollo Metals, Inc., under state and federal law.

The defendants filed a motion for partial summary judgment on the plaintiff's four state law tort claims,[1] arguing that Pennsylvania's two-year statute of limitations precludes these claims. Each side briefed the matter and presented its case at a hearing on Nov. 28, 2017. Taking into consideration the parties' briefings and oral arguments, I will deny the defendants' motion because there are genuine issues of material fact as to whether Atlantic knew or should have known, more than two years before filing its 2014 lawsuit, of contamination on its property stemming from Apollo's property.

---

1 The four claims at issue in the defendants' motion for partial summary judgment are negligence, trespass, nuisance, and strict liability (counts V–VII). (Defs.' Mot. for Partial Summ. J. 1, Doc. No. 27.)

1

## II. BACKGROUND

Atlantic, a Pennsylvania company, operates a commercial storage facility on its property, which it purchased in 1997. (Compl. ¶¶ 4, 9, Doc. No. 1.) Apollo, also a Pennsylvania company, purchased its neighboring property seven years earlier, in 1990, and operates a steel manufacturing facility. (Id. ¶ 12.) Atlantic's property is "immediately adjacent to, and downgradient from" Apollo's. (Id. ¶ 10.) Atlantic alleges that its groundwater has become polluted by hexavalent chromium and TCE, pollutants that migrated from the defendant's property. (Id. ¶¶ 13–14.)

The plaintiff claims that the presence of these pollutants on its property "was confirmed in an October 2012 environmental covenant" between the defendants and the Pennsylvania Department of Environmental Protection ("PADEP"), which "imposed certain use and activity limitations on Defendants' property" and properties impacted by the migrating groundwater pollution. (Id. ¶¶ 15–16.)

Sometime around 2012, the defendants offered to "close three existing, inactive wells" on the plaintiff's property. (Id. ¶ 19.) Curious as to why the defendants would make such an offer, the plaintiff hired American Analytical & Environmental Inc. ("AAE") to assess the situation. (Id. ¶ 20.) AAE did so and provided Atlantic with a report in Feb. 2013, which explained that hexavalent chromium and TCE had migrated from underneath the defendants' property to Atlantic's. (Id. ¶ 21.) AAE also informed Atlantic that the covenant between the defendants and the PADEP prevented Atlantic from using the groundwater underneath its property and required PAEDP approval to initiate the use of its existing but inactive wells. (Id. ¶ 22.) This restriction on the

plaintiff's property is significant because the plaintiff had planned to install a geothermal heating system, which would use the well water. (Id. ¶ 24.)

While the plaintiff contends that the Feb. 2013 AAE report, which it commissioned after the defendants offered to pay to close its wells, triggered the tolling of the statute of limitations, the defendants argue in their motion for partial summary judgment that the statute of limitations began running either in 2004 or 2007, thereby barring the four state tort claims.

## III. PROCEDURAL HISTORY

The plaintiff initiated this dispute in the Lehigh County Court of Common Pleas on Oct. 1, 2014. (Defs.' Mot. for Partial Summ. J. 1, Doc. No. 27.) Eventually, Atlantic discontinued its state court claims and initiated this federal lawsuit on Nov. 30, 2016. (Id.) On Aug. 16, 2017, Apollo filed a motion for partial summary judgment on the plaintiff's four Pennsylvania common law tort claims, arguing that the state statute of limitations had run. (Doc. No. 27.) On Sept. 11, 2017, Atlantic filed its response. (Doc. No. 30.) And on Oct. 3, 2017, Apollo filed its reply. (Doc. No. 31.) At a hearing on Nov. 28, 2017, the parties argued their respective sides of the dispute. The issue is now ripe for decision.

## IV. LEGAL STANDARD

A court shall grant summary judgment where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it would affect the outcome of the case under applicable law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A disputed issue is "genuine" if it would allow a reasonable fact-finder to return a verdict in favor of the nonmoving party. Id. Summary judgment is appropriate when the nonmoving party fails to provide evidence "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

The party seeking summary judgment must inform the court of the basis for its motion and identify the portions of the record that demonstrate "the absence of a genuine issue of material fact." Id. at 323. Relevant portions of the record include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1). Alternatively, the moving party can show "that the materials cited [by the nonmoving party] do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Id.

When determining whether to grant summary judgment, a court must draw "all justifiable inferences" in favor of the nonmoving party and must conclude not whether "the evidence unmistakably favors one side or the other but whether a fair-minded jury

could return a verdict for the plaintiff on the evidence presented." Anderson, 477 U.S. at 252, 255.

## IV. DISCUSSION

The defendants contend that partial summary judgment in their favor is warranted because Pennsylvania's statute of limitations bars the plaintiff's four tort claims—negligence, trespass, nuisance, and strict liability (counts V–VII). (Defs.' Mot.) Based on the following analysis, I find that summary judgment is not proper because the statute of limitations determination hinges on questions of material fact that a jury must decide.

Pennsylvania imposes a two-year statute of limitations on "tortious conduct," which encompasses the four claims noted above. See 42 Pa. C.S. § 5524(7) (2017). It is well established that federal courts must apply state statutes of limitation to state law claims. See Guaranty Trust Co. of N.Y. v. York, 326 U.S. 99, 110 (1945).

### A. *Pennsylvania's Statute of Limitations and the Discovery Rule Exception*

The Pennsylvania Supreme Court thoroughly articulated the application of and exceptions to Pennsylvania's statute of limitations in a 2005 negligence case. See Fine v. Checcio, 870 A.2d 850 (Pa. 2005). Generally, limitations periods in Pennsylvania begin tolling "when the plaintiff could have first maintained the action to a successful conclusion." Id. at 857 (citing Kapil v. Ass'n of Pa. State Coll. and Univ. Faculties, 470 A.2d 482, 485 (1983)). The discovery rule is an exception to this general principle; it tolls the limitations period while a party "who has not suffered an immediately ascertainable injury is reasonably unaware he has been injured." Id. at 858 (citing Hayward v. Med.

5

Center of Beaver Cty., 608 A.2d 1040, 1043 (1992), *abrogated by* Fine, 870 A.2d 850). When this discovery rule exception applies, the statute of limitations commences when "the injured party discovers or reasonably should discover that he has been injured and that his injury has been caused by another party's conduct." Id. at 859.

To qualify for the discovery rule exception, the injured party must have exercised "reasonable diligence" toward discovering the injury and its cause. Id. at 858 (citing Pocono Int'l Raceway, Inc. v. Pocono Produce, Inc., 468 A.2d 468, 471 (Pa. 1983)). Reasonable diligence is "not an absolute standard, but is what is expected from a party who has been given reason to inform himself of the facts upon which his right to recovery is premised." Id. It is measured by an objective standard of how a reasonable person would act under the same circumstances. Crouse v. Cyclops Indus., 745 A.2d 606, 611–12 (Pa. 2000). A court should examine whether the party exhibited "those qualities of attention, knowledge, intelligence and judgment which society requires of its members for the protection of their own interest and the interest of others." Fine, 870 A.2d at 858 (quoting Crouse, 745 A.2d at 611). "The *sine qua non* of the factual inquiry into the applicability of the discovery rule in any given case is the determination whether, during the limitations period, the plaintiff was able, through the exercise of reasonable diligence, to know that he or she had been injured and by what cause." Gleason v. Borough of Moosic, 15 A.3d 479, 485 (Pa. 2011).

Pursuant to the discovery rule, the limitations period commences when the plaintiff has "'inquiry notice' that is tied to 'actual or constructive knowledge of at least some form of significant harm and of a factual cause linked to another's conduct, without

6

the necessity of notice of the full extent of the injury, the fact of actual negligence, or precise cause.'" Gleason, 15 A.3d at 484 (quoting Wilson v. El-Daief, 964 A.2d 354, 364 (Pa. 2009)).

If reasonable minds could disagree about whether a party exercised reasonable diligence, it is a question of fact for a jury to decide. Fine, 870 A.2d at 859. However, the court may decide as a matter of law that the discovery rule does not apply where reasonable minds could not disagree regarding whether a party "knew or should have known [of his injury and its cause] on the exercise of reasonable diligence." Id.

### B. *The Defendants' Claim and the Disputed Triggering Events*

The defendants claim that Atlantic received notice of potential groundwater contamination caused by Apollo on several occasions beginning in 2004, sufficient to trigger the running of the statute of limitations. (Defs.' Mot. 10.) They argue that summary judgment in their favor on the plaintiff's state tort claims is proper because Atlantic did not commence legal action until 2014, long after the statute of limitations had run. (Defs.' Mot. 1.) The plaintiff responds that summary judgment is inappropriate because a genuine issue of material fact exists as to whether Atlantic "knew, or reasonably should have known" more than two years before it sued that it suffered an injury to its property caused by Apollo. (Pl.'s Resp. 1, Doc. No. 30.) I agree with the plaintiff that summary judgment is not proper because reasonable minds can differ as to whether Atlantic knew or should have known of its injury and its cause before 2012.

Apollo argues that the discovery rule should not apply here because Atlantic had gleaned ample notice of contamination from its environmental consultant in 2004 and

7

2007 (discussed below) and because Atlantic failed to exercise diligence and investigate based upon its knowledge. (Defs.' Reply 1.) Atlantic claims that it did not know of "actionable groundwater contamination" on its property more than two years prior to filing its 2014 lawsuit. (Pl.'s Resp. 15.) Further, it argues that "there is a genuine dispute as to whether Atlantic <u>reasonably should have known</u> of groundwater contamination on the Atlantic Property more than two years prior to October 1, 2014" and whether it had notice that would trigger a duty to investigate further. (Id. 15–16.)

The analysis below is organized chronologically by critical event, based on the defendants' and plaintiff's statements of facts, with each summary of facts followed by my conclusion. I have omitted minor events that did not impact my analysis and were not discussed by the parties in their oral arguments.

**1. 2004 –Atlantic's Phase I and Phase II Environmental Assessments**

Atlantic hired AAE "to conduct a Phase I environmental assessment" of its property, which it completed in May 2004. (Defs.' Statement of Material Facts ¶¶ 15, 19, Doc. No. 27-2 [hereinafter Defs.' Facts].) Atlantic notes that the assessment "was motivated, in part, by the discovery of five-gallon paint drums, containing lead paint, abandoned alongside the Atlantic Property, adjoining a different neighboring facility, not Apollo Metals." (Pl.'s Counterstatement of Material Facts ¶ 15, Doc. No. 31-1 [hereinafter Pl.'s Facts].)

A Phase I assessment is "a nonintrusive investigation meant to identify issues that would be a liability to the property owner and involves a site visit, interviews with knowledgeable individuals, and a check of regulatory records held by state and federal agencies." (Defs.' Facts ¶ 17.) The defendants state that this type of assessment "does not recommend specific action" and leaves that up to the property owner. (Id. ¶ 18.) The plaintiff adds that Douglas Sammak, the president of AAE and Atlantic's point of contact, offered his "professional opinion about whether work should or should not be performed" to rectify issues identified in Phase I assessments. (Pl.'s Facts ¶¶ 17–18.)

The 2004 Phase I final report is no longer available due to the passage of time, but Atlantic produced an incomplete, unsigned copy, attached to the defendants' motion for partial summary judgment as Exhibit F. (Defs.' Facts ¶ 20.) The parties each characterize this report differently. According to the defendants, it "identified the possibility of groundwater contamination migrating from Apollo Metals." (Id. ¶ 21.) They state: "Specifically, the 2004 Phase I included a finding that 'Apollo Metals (formerly Superior Metals) is currently investigating the extent of groundwater contamination and has proposed soil remediation for media that has been impacted by their manufacturing operations, ongoing since the early 1920s.'" (Id. ¶ 22.) The defendants also state that the 2004 report provided the AAE's opinion—that "the fact that historic use of the adjacent properties for industrial purposes has resulted in soil and groundwater contamination is a potential environmental concern for the [Atlantic Property]. It is possible that the groundwater contamination originating from [adjacent properties] extends beneath the

9

[Atlantic Property], however, based on available information, there is no reason to suspect the [Atlantic Property] as a possible source." (Id. ¶ 22 (alterations in original).)

The plaintiff denies the defendants' characterization of the 2004 report, states that it speaks for itself, and quotes portions that put the defendants' statements in context. (Pl.'s Facts ¶ 21.) The quoted portions read:

> 7) The properties adjacent and upgradient of the site include Apollo Metals . . . . Apollo Metals . . . is currently investigating the extent of groundwater contamination and has proposed soil remediation for media that has been impacted by their manufacturing operations. Ongoing since the early 1920s.
> . . .
> Finding 7), the fact that historic use of the adjacent properties for industrial purposes has resulted in soil and groundwater contamination is a potential environmental concern for the [Atlantic Property]. It is possible that groundwater contamination originating from these sites extends beneath the subject property, however, based on available information, there is no reason to suspect the [Atlantic Property] as a possible source. Based on the fact that the source of groundwater contamination in the area has been identified, public water is available in the area, and that the PA DEP has established oversight of the open cases[,] it is [AAE's] opinion that the groundwater contamination . . . will not have an adverse impact on the [Atlantic Property].

(Id. ¶¶ 21–22 (quoting Doc. 27-8 at 6–7) (alterations in original).)

In 2004, Sammak also discussed with Mark Silvester (owner and officer of Atlantic) the "possibility of groundwater contamination migrating from the Apollo Property to the Atlantic Property." (Defs.' Facts ¶ 25.) Atlantic does not dispute this but added that Sammak's opinion, evidenced by his Phase I report, also included that any

10

contamination from Apollo "will not have an adverse impact on the [Atlantic Property]." (Pl.'s Facts ¶ 25 (alteration in original).)

The defendants state that Atlantic "did nothing" to further explore possible contamination after the 2004 Phase I opinion. (Defs.' Facts ¶ 26.) The plaintiff does not dispute its lack of action regarding potential contamination from Apollo's property but again notes the following language from the Phase I report as justification: "Based on the fact that the source of groundwater contamination in the area has been identified, public water is available in the area, and that the PA DEP has established oversight of the open cases, it is [AAE's] opinion that the groundwater contamination . . . will not have an adverse impact on the [Atlantic Property]." (Pl.'s Facts ¶ 26.)

Following the Phase 1 report, Atlantic requested and AAE prepared a Phase II environmental assessment of Atlantic's property. (Defs.' Facts ¶ 29.) A Phase II assessment is a follow-up investigation to address concerns raised by Phase I. (Id. ¶ 30.) Atlantic requested Phase II "to address potential contamination issues relating to 'drums being stored adjacent to [Atlantic's] property line' that had been identified in the 2004 Phase I." (Defs.' Facts ¶ 31 (alteration in original).) The property line bordered a different facility, not Apollo. (Id.) As part of the Phase II investigation, AAE conducted soil testing around the drums for several contaminants, including chromium, and found chromium "at elevated concentrations but below action levels." (Defs.' Facts ¶¶ 32–33.)

The facts in this section seem to indicate that Atlantic was aware of potential chromium contamination on *Apollo's property*. However, given the language quoted by the plaintiff from the Phase I report, it remains unclear whether Atlantic knew or should

11

have known that it suffered an injury to *its property*. It is equally unclear whether Atlantic had enough information after the Phase I results to incur a duty to exercise reasonable diligence and to further explore the potential contamination that migrated from Apollo's property. Further, Atlantic did follow up with a Phase II assessment on an issue separate from the Apollo contamination, which could indicate that it exercised reasonable diligence. Reasonable minds can differ regarding whether a reasonable person would have further explored the possibility of contamination from Apollo. Therefore, this issue is not appropriate for summary judgment and is fit for a jury to decide. Fine, 870 A.2d at 859.

   2. **2005 – Apollo's Request to Place Monitoring Well on Atlantic's Property**

In 2005, Apollo (through EMC) sought permission from Atlantic to place a monitoring well on its property to analyze groundwater quality. (Defs.' Facts ¶ 34.) The letter seeking permission was accompanied by "a map showing EMC's plans for a network of monitoring wells on and around the Apollo Metals, Atlantic, and Weir Welding properties." (Id. ¶ 35.) The defendants state that Atlantic did not grant permission for Apollo to install a monitoring well on its property. (Id. ¶ 36.) However, the plaintiff denies this and contends that it did grant permission but did not believe it owned the portion of the property upon which the well would be installed. (Pl.'s Facts ¶ 36.)

This subsection of facts speaks to the plaintiff's reasonable diligence or lack thereof. The parties' disagreement on this point reveals a genuine issue of material fact.

Therefore, this issue is not appropriate for summary judgment and should be reserved for a jury. Fine, 870 A.2d at 859.

### 3. 2007 – Atlantic's Second Phase I Environmental Assessment

In 2007, AAE completed a second Phase I assessment of Atlantic's property, on behalf of Team Capital Bank. (Defs.' Facts ¶ 41.) Silvester, Atlantic's owner and officer, was applying for a loan through the bank, using the Atlantic warehouse as collateral. (Pl.'s Facts ¶ 41.) Though this Phase I report was prepared for a financial institution, Atlantic received a copy. (Defs.' Facts ¶ 42.)

The 2007 Phase I report stated that its purpose was "to determine whether there are 'Recognized Environmental Conditions' (RECs) on the [Atlantic Property] that may have an impact on the purchase, use or future sale of the property or create a liability to the user from a governmental or private party." (Id. ¶ 43.) The report stated that the migration of contaminated groundwater from Apollo to Atlantic constituted "a recognized environmental condition," which essentially means actual or likely contamination. (Id. ¶¶ 44–46.) The 2007 report additionally contained material from an interview with Cydney Faul-Halsor, the PADEP project officer responsible for the department's cases concerning Apollo. (Id. ¶ 48.) The report stated that according to Faul-Halsor, "monitoring wells are needed on the [Atlantic Property] and/or Gary Street to determine the extent of contamination." (Id. ¶ 50.)

The plaintiff admits the facts presented and adds: "As with the 2004 Phase I, AAE also provided the following opinion: 'Due to the fact that the source of groundwater contamination in the area has been identified and removed, public water is available in

13

the area, and that the PA DEP has established oversight of the open cases, it is [AAE's] opinion that the groundwater contamination . . . will not have an adverse impact on the [Atlantic Property].'" (Pl.'s Facts ¶ 50.)

Further, the defendants state that the 2007 report provided the opinion that "the fact that historic use of the adjacent upgradient property [*i.e.*, Apollo Metals] for industrial purposes has resulted in groundwater contamination is a potential environmental concern for the [Atlantic Property]. Based on available information, there is no reason to suspect the [Atlantic Property] as a possible source of contamination; however, the probability that the groundwater contamination extends beneath the [Atlantic Property] is a REC [*i.e.*, a recognized environmental condition]." (Defs.' Facts ¶ 51.)

The plaintiff responds that the 2007 Phase I report is "a written document that speaks for itself" and quotes the relevant portion:

> Finding 7) the fact that historic use of the adjacent upgradient property for industrial purposes has resulted in groundwater contamination is a potential environmental concern for the Site. Based on available information, there is no reason to suspect the [Atlantic Property] as a possible source of the contamination; however, the probability that the groundwater contamination extends beneath the [Atlantic Property] is a REC. Due to the fact that the source of groundwater contamination in the area has been identified and removed, public water is available in the area, and that the PA DEP has established oversight of the open cases, it is [AAE's] opinion that the groundwater contamination . . . will not have an adverse impact on the [Atlantic Property.]

(Pl.'s Facts ¶ 51.)

14

Atlantic did not take further steps to investigate the 2007 Phase I findings. (Defs.' Facts ¶ 54.)

Whether this report imparted knowledge sufficient that Atlantic knew or should have known that it suffered an injury to its property caused by Apollo is a tough call, mainly because the report contains conflicting messages. On the one hand, the report includes enough factual information to impart knowledge of an injury and its likely cause. On the other hand, the report states that the potential contamination "will not have an adverse impact" on Atlantic. With that, it is unclear how a reasonable person should have reacted to these mixed messages. Therefore, the issue is not appropriate for resolution by summary judgment. See Fine, 870 A.2d at 859.

### 4. 2008 – Request to Place a Monitoring Well on Atlantic's Property

The defendants state that sometime after 2007, Apollo again sought permission from Atlantic to either use existing wells or install new monitoring wells to analyze groundwater quality on Atlantic's property at Apollo's expense—and that Atlantic denied permission. (Defs.' Facts ¶ 55.) Atlantic states that it granted permission but that it did not believe it owned the property upon which the well was to be installed. (Pl.'s Facts ¶ 55.)

Further, the defendants state that EMC e-mailed Silvester (Atlantic's owner) requesting permission to install a monitoring well on Atlantic's property, and that in a June 5, 2008 e-mail, Atlantic again declined to grant permission. (Defs.' Facts ¶¶ 56–58.) Again, Atlantic contends that it did not deny Apollo's request to install a monitoring well.

(Pl.'s Facts ¶ 57.) The defendants further state that EMC e-mailed Silvester a second time on July 3, 2008 requesting permission, and that Silvester did not respond. (Defs.' Facts ¶¶ 58–59.) The plaintiff admits that Silvester did not respond to this second e-mail, but again states that Atlantic granted permission for the well to be installed. Additionally, the plaintiff states that a monitoring well was installed "in or around 2009 . . . in that portion of the Atlantic Property, within the Gary Street right of way." (Pl.'s Facts ¶ 59.)

Clearly, there is a factual dispute between the parties as to whether Atlantic granted or denied permission for Apollo to install a monitoring well on its property. Whether this is a material fact is debatable. Regardless, summary judgment is not appropriate based on this subset of facts.

### 5. **2012–2014 – Atlantic Tests Its Groundwater, Later Initiates Lawsuit**

In May 2012, Silvester contacted AAE, Atlantic's environmental consultant, regarding "sludge and some orange material" in one of Atlantic's wells. (Defs.' Facts ¶ 68.) Atlantic adds that it discovered this material while "studying its well capacity for installation and use of a geothermal heat system." (Pl.'s Facts ¶ 68.)

On May 11, 2012, AAE tested the material for several contaminants, including chromium. (Defs.' Facts ¶ 69.) The parties differ in their characterizations as to why AAE tested for chromium. The defendants state that AAE tested for chromium because it was a "recognized environmental condition" on Atlantic's property. (Id. ¶ 70.) Atlantic states that AAE tested for chromium because of the contamination on Apollo's upgradient property. (Pl.'s Facts ¶ 70.) No chromium was detected in the groundwater sample provided by Atlantic that AAE tested. (Defs.' Facts ¶ 72.)

16

Atlantic initiated its lawsuit against Apollo on Oct. 1, 2014. (Defs.' Facts ¶ 76.) Atlantic states that it sued following a 2013 environmental review by AAE and contends that there had not previously been "any definitive evidence or indication of groundwater contamination on the Atlantic Property, stemming from the release on the Apollo Property." (Pl.'s Facts ¶ 76.) Atlantic further states that the AAE environmental review revealed that Atlantic's use of the existing wells on its property was "restricted by the terms of an environmental covenant between Defendants and PA DEP." (Id. ¶ 76.) It further states that the 2013 environmental review "was triggered by Defendants' offer to cap existing wells on the Atlantic Property free of charge in December 2012." (Id. ¶ 76.)

The plaintiff frames its argument on this point as follows: "Only in February 2013, a few months after being approached by Defendants, or Defendants via EMC, to cap one of the existing wells on the Atlantic Property, did Atlantic finally learn that restrictions had been placed on its use of the existing wells on the Atlantic Property. Those restrictions, in turn, inhibited Atlantic's ability to install and use a cost-saving geothermal heating pump in the facility on the Atlantic Property. Reasonably believing that the threat to the Atlantic Property had actually matured, Atlantic proceeded to file suit against Defendants on October 1, 2014." (Pl.'s Resp. 18.)

The quality of the plaintiff's knowledge of injury to its property after 2012 (within the statute of limitations), which the plaintiff contends led it to sue, is different and much more definitive than the quality of the plaintiff's knowledge after the events prior.

Given the above analysis of each factual event, there appears to be a genuine issue of material fact as to whether Atlantic knew or should have known prior to 2012 of the

injury to its property caused by Apollo. Therefore, I am denying the defendants' motion for summary judgment because this issue should be properly decided by a jury.

An appropriate order follows.