IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ATLANTIC HOLDINGS LIMITED,** | : | **CIVIL ACTION** |
| *Plaintiff,* | : | |
| | : | |
| **v.** | : | **No. 16-6247** |
| | : | |
| **APOLLO METALS, LTD.,** | : | |
| *Defendant.* | : | |
| | : | |

## MEMORANDUM

## I.    INTRODUCTION

This action involves a groundwater contamination dispute between

neighboring owners of industrial properties.  Plaintiff, Atlantic Holdings Limited

("Atlantic"), filed claims against Defendant, Apollo Metals, Ltd. ("Apollo"), under

state and federal law.  Specifically, Plaintiff set forth the following claims:

violation of the Comprehensive Environmental Response, Compensation, and

Liability Act ("CERCLA") (Count I), violation of the Resource Conservation

Recovery Act "(RCRA") (Count II), violation of Pennsylvania's Hazardous Sites

Cleanup Act ("HSCA") (Count III), violation of Pennsylvania's Clean Streams

Law ("CSL") (Count IV), negligence (Count V), trespass (Count VI), nuisance

(Count VII), and strict liability (Count VIII).  ECF No. 1.

Defendant filed a Motion for Summary Judgment contending, among other things,[1] that Plaintiff's state law tort claims for negligence, trespass, nuisance, and strict liability (Counts V through VIII) were barred by the applicable two-year statute of limitations because Plaintiff was undeniably aware in 2007 of contamination on its property stemming from Defendant's property.

Defendant also contends that Plaintiff's various statutory claims should be dismissed. Specifically, Defendant contends that Plaintiff's CERCLA and HSCA claims should be dismissed because Plaintiff has not incurred any necessary response costs as defined by those statutes and because any costs incurred by Plaintiff were not consistent with the National Contingency Plan. Defendant contends that Plaintiff's RCRA claim should be dismissed because Plaintiff cannot prove any substantial and imminent danger to human health or the environment. Defendant contends Plaintiff's CSL claim should be dismissed because Plaintiff

---

[1] In addition, Defendant contends that the common law claims should be dismissed because Defendant is not liable at common law for historical torts committed by the former owner of its property, the prayers for injunctive relief on the common law claims should be dismissed because Plaintiff has an adequate remedy at law, the negligence claim should be dismissed because Defendant had no duty to Plaintiff in connection with that voluntary cleanup, the trespass claim should be dismissed because Plaintiff cannot prove any intentional invasion of its property, the private nuisance claim should be dismissed because Plaintiff cannot prove any real and appreciable interference with its use and enjoyment of its property, and the strict liability claim should be dismissed because Defendant's electroplating operations are not abnormally dangerous as a matter of law. ECF No. 91 at pp. 2-3. Because all four of Plaintiff's common law claims will be dismissed as time-barred, the Court need not consider these additional arguments.

cannot prove any current or ongoing violation or likely future violation of that statute.[2]

For the following reasons, Defendant's Motion for Summary Judgment will be granted.

## II.  BACKGROUND[3]

All of Plaintiff's claims arise under the overarching allegation that its groundwater has become polluted by hexavalent chromium and TCE, pollutants that migrated from Defendant's property. ECF No. 1 at ¶¶ 13-14.  Plaintiff is a Pennsylvania company that operates a commercial storage facility on the property it purchased in 1997, ECF No. 1 ¶¶ 4 & 9, which is located "immediately adjacent to, and downgradient from" Defendant's property, which was purchased by Defendant in 1994 and is home to a steel manufacturing facility.  ECF No. 1 at ¶ 10 & 12.

According to William Flederbach, who served as the plant engineer, plant manager, and chief operating officer at Defendant over the span of thirty years, following the discovery of elevated levels of hexavalent chromium in the

---

[2] Defendant also contended that the claims alleged against nominal Defendant Apollo Metals, Inc. be dismissed because that entity does not exist and is not amenable to suit or judgment.  In light of Plaintiff's concession that "it no longer believes that it has a sustainable cause of action against [Apollo Metals, Inc.] and will concede on this issue[,]" the Court dismissed Apollo Metals, Inc. from this case in the Order dated January 29, 2019.  ECF No. 150.

[3] The following background is the undisputed material facts from the record.

3

groundwater below a neighboring industrial property not involved in this suit in 2003, Defendant began investigating possible chromium sources associated with historic or ongoing manufacturing activities on Defendant's property. ECF No. 91-3, Decl. William Flederbach, at ¶¶ 2 & 6. That same year, Defendant discovered a disused concrete condensate basin located outside of Defendant's building; the basin had been used by a prior unrelated owner of the facility to collect chromium water vapor emitted from the chromium electroplating line. *Id.* at ¶ 7. Defendant's investigation revealed that the prior owner had discontinued use of the chromium condensate basin in the 1960s or early 1970s after installing upgraded technology that controlled vapor emissions directly at the chromium electroplating line and eliminated the need for the condensate basin. *Id.*

After discovering the disused chromium condensate basin, Defendant retained an environmental consultant from Environmental Maintenance Company ("EMC") to remove its contents and remediate the surrounding soil. *Id.* at ¶ 8. "EMC removed and disposed of the contents of the basin and analyzed the surrounding soil, detecting chromium concentrations in several soil samples that exceeded the then-prevailing cleanup standards." *Id.* Defendant reported those soil analysis results in writing to the Pennsylvania Department of Environmental Protections ("PADEP") in September 2003. As part of its remediation of the disused chromium condensate basin, Defendant reviewed its property records and

4

identified eight monitoring wells that had originally been installed in the 1990s by a prospective purchaser during the pre-transaction due diligence. *Id*. at ¶ 9. In May and August 2003, EMC obtained new groundwater samples from the monitoring wells and confirmed elevated concentrations of chromium. *Id*. In July 2004, EMC removed the chromium condensate basin and excavated the underlying soil down to the bedrock, ultimately removing and disposing of 30 tons of material. ECF No. 91-3 at ¶ 10. Defendant reported these remediation activities in writing to PADEP in September 2004. *Id*.

### The 2004 Phase I Report

Sometime in 2004, Plaintiff retained Douglas Sammak to conduct a Phase I environmental assessment of Plaintiff's property. ECF No. 91-3, Dep. Tr. Douglas Sammak (Day 1), at 13:12–14:21. The 2004 Phase I study was motivated in part by the discovery of five-gallon paint drums, containing lead paint, abandoned alongside Plaintiff's property adjoining a neighboring property not involved in this suit. *Id*. at 34:11-23, 79:24–80:20. In May 2004, Sammak completed the Phase I environmental assessment for Plaintiff's property. *Id*. at 31:4-10; ECF No. 91-3, Dep. Tr. Mark Silvester (Day 1), at 15:17-21, 18:24–19:3. The 2004 Phase I Report included a finding that "Apollo Metals is currently investigating the extent of groundwater contamination and has proposed soil remediation for media that has been impacted by their manufacturing operations, ongoing since the early

5

1920s." ECF No. 91-3, Dep. Tr. Douglas Sammak (Day 1), at 35:10-23; ECF No.

91-8, 2004 Phase I Report, at ATLANTIC 840. The report also included

Sammak's opinion that:

> the fact that historic use of the adjacent properties for industrial
> purposes has resulted in soil and groundwater contamination is a
> potential environmental concern for [Plaintiff's property]. It is possible
> that groundwater contamination originating from these sites extends
> beneath the subject property, however, based on available information,
> there is no reason to suspect [Plaintiff's property] as a possible source.
> Based on the fact that the source of groundwater contamination in the
> area has been identified, public water is available in the area, and that
> the PA DEP has established oversight of the open cases, it is AA&E's
> opinion that the groundwater contamination associated with these
> properties will not have an adverse impact on [Plaintiff's property].

ECF No. 91-3, Dep. Tr. Douglas Sammak (Day 1), at 37:12–38:2; ECF No. 91-8,

2004 Phase I Report, at Atlantic 841. During the course of the Phase I Report

investigation, Sammak discussed with Mark Silvester, the sole owner and officer

of Plaintiff,[4] the possibility of groundwater contamination migrating from

Defendant's property. ECF No. 91-3, Dep. Tr. Douglas Sammak (Day 1), at 31:4-

16; ECF No. 91-3, Dep. Tr. Mark Silvester (Day 1), at 25:6-9. Despite the fact that

Silvester understood the 2004 Phase I Report to state that groundwater

contamination originating from Defendant had migrated below Plaintiff's property,

Silvester did not follow up on that finding. ECF No. 91-3, Dep. Tr. Mark Silvester

(Day 1), at 25:6-9 (stating that Silvester understood that the 2004 Phase I Report

---

[4] ECF No. 91-3, Dep. Tr. Mark Silvester (Day 1), at 8:2-7.

6

"is saying that ground water contamination originating from [Defendant] may be extending beneath [Plaintiff]."); *id.* at 25:1-5 ("Q: Okay. Now, so my question to you is, what, if anything, did you do to follow-up on that opinion after this assessment was prepared? A: Well, nothing."). Further, Plaintiff did not request that Sammak or anyone else monitor PADEP's "open cases" as referenced in the 2004 Phase I Report. ECF No. 91-3, Dep. Tr. Mark Silvester (Day 1), at 28:11-20.

Toward the end of 2005, Defendant, through EMC, contacted Plaintiff in writing to seek permission to install a monitoring well on Plaintiff's property, at Defendant's expense, to analyze groundwater quality. ECF No. 91-3, Decl. William Flederbach, at ¶ 11. Plaintiff received that letter from EMC, which explained Defendant's request and was accompanied by a map showing EMC's plan for a network of monitoring wells on and around Defendant's property, Plaintiff's property, and a third property not involved in this suit. ECF No. 91-3, Dep. Tr. Mark Silvester (Day 1), at 35:17–36:4, 36:22–37:23, 40:2-24; ECF No. 91-8, EMC Letters, at APOLLO-PADEP 15-19. In response to the request, Plaintiff, via Plaintiff's site manager Bernie Kimmet, denied permission to install the monitoring well directly on its property but granted permission for the installation of a monitoring well on a portion of Plaintiff's property that Plaintiff did not believe it actually owned. ECF No. 91-3, Dep. Tr. Mark Silvester (Day 1), at 41:1–42:4. Kimmet testified that he discussed with Silvester the possibility that

Plaintiff's groundwater was contaminated shortly before Defendant requested to install monitoring wells on the property. ECF No. 91-3, Dep. Tr. Bernie Kimmet, at 88:24–90:6, 90:13-22, 91:5–92:3. Kimmet further testified that Defendant was "looking to drill wells on Westside Warehouse property, and [Silvester] did not want them to drill wells on Westside Warehouse property," *id.* at 93:11–94:7, because "[h]e did not want to get involved in anything that had to do with environmental issues on his property. It wasn't – he didn't feel like it was a matter related – that it was our problem, I guess. Apollo apparently had a problem, at least that was apparent at the time, we didn't know what it was, because it wasn't spelled out to us via e-mail exactly what it was. There was some monitoring they needed to do. We didn't know exactly why. He didn't want to get involved with that. I don't know exactly why though." *Id.* at 94:8–95:2. Sammak had similar conversations with Silvester: "[Silvester's] position was that he was not enthusiastic about it because it would degrade the value of his property and that he suggested to them that they could find other areas such as in the public right-of-way beyond his property or whatnot that they would be able to obtain the data they were looking for." ECF No. 91-3, Dep. Tr. Douglas Sammak (Day 2), at 114:7–115:22.

<u>The 2007 Phase I Report</u>

In 2007, Plaintiff again hired Sammak, this time to complete another Phase I Environmental Assessment of Plaintiff's property on behalf of Team Capital Bank as part of the process for obtaining a loan. ECF No. 91-3, Dep. Tr. Douglas Sammak (Day 1), at 41:11-22; ECF No. 91-4, 2007 Phase I Report. Although the 2007 Phase I Report was prepared for a financial institution, Atlantic received a copy of the report at or around the time it was prepared. ECF No. 91-3, Dep. Tr. Mark Silvester (Day 1), at 48:3-5. The 2007 Phase I stated its purpose was "to determine whether there are 'Recognized Environmental Conditions' (RECs) on the [Atlantic Property] that may have an impact on the purchase, use or future sale of the property or create a liability to the user from a governmental or private party." ECF No. 91-4, 2007 Phase I Report, at ATLANTIC 453. Sammak determined, as evidenced in the report, that "[t]he migration of contaminated groundwater onto the [Atlantic Property] from the adjacent Apollo Metals Facility" constitutes a "recognized environmental condition" in connection with the Atlantic Property. ECF No. 91-3, Dep. Tr. Mark Silvester (Day 1), at 46:11-25, 85:6-11; (Day 2) at 102:16-25, 104:24–105:14, 106:18–107:6; ECF No. 91-4, 2007 Phase I Report, at 452 & 464. As the term is used in the 2007 Phase I, a "recognized environmental condition" is "the presence or likely presence of any hazardous substances…on a property under conditions that indicate an existing release, a past

9

release, or a material threat of release of any hazardous substances…into structures on the property or into the ground, groundwater, or surface water of the property." ECF No. 91-4, 2007 Phase I Report, at ATLANTIC 454. Notably, "recognized environmental conditions" do not include "*de minimis* conditions that generally do not present a material risk of harm to public health or the environment and that generally would not be subject of an enforcement action if brought to the attention of appropriate governmental agencies. Conditions determined to be *de minimis* are not *recognized environmental conditions*." *Id.*

Sammak listed the migration of contaminated groundwater as a recognized environmental condition based on a records review, interviews, and an examination of Plaintiff's property. ECF No. 91-3, Dep. Tr. Mark Silvester (Day 1), at 47:15–48:3. Among the other interviews conducted in preparing the 2007 Phase I Report, Sammak's company interviewed the PADEP project officer responsible for the relevant PADEP case files concerning Defendant's environmental investigation. ECF No. 91-4, 2007 Phase I Report, at ATLANTIC 462. The 2007 Phase I records that the project officer provided:

> information regarding the status of the ongoing investigation of groundwater contamination associated with the adjacent, upgradient Apollo Metals Property. According to available documentation and [the project officer]'s statements, the groundwater contamination at the adjacent property originated from a condensate basin associated with the facility's chromium plating line and is impacted primarily by chromium and to a lesser amount by cadmium and mercury. The condensate basin and contaminated soil was removed in July 2004….

10

According to [the project officer], groundwater monitoring continues at the facility's on-site wells; however, characterization of the extent of contamination requires the installation of monitoring wells on the [Plaintiff Property] and/or within the Gary Street Right-of-Way. Requests for permission to install the required monitoring wells was submitted to property owners and the City of Bethlehem in 2005; access has not yet been granted for the installation of these off-site wells.

*Id.* The 2007 Phase I includes, among its findings, "[t]he Northeast Regional Office of PADEP maintains files for Apollo Metals.... Apollo Metals is currently investigating the extent of groundwater contamination resulting from their manufacturing operations, ongoing since the early 1920s. According to [the project officer], monitoring wells are needed on the [Plaintiff Property] and/or Gary Street to determine the extent of contamination." *Id.* at ATLANTIC 463.

The report also states an opinion, based on the above-referenced finding, that "the fact that historic use of the adjacent upgradient property [*i.e.*, the Defendant Property] for industrial purposes has resulted in groundwater contamination is a potential environmental concern for the [[Plaintiff] Property]. Based on available information, **there is no reason to suspect the [[Plaintiff] Property] as a possible source of contamination; however, the probability that the groundwater contamination extends beneath the [[Plaintiff] Property] is a REC** [*i.e.*, a recognized environmental condition]." *Id.* at ATLANTIC 464 (emphasis added). As with the 2004 Phase I, Sammak also provided the same opinion: "Due to the fact that the source of groundwater contamination in the area

11

has been identified and removed, public water is available in the area, and that the PADEP has established oversight of the open cases, it is [AAE's] opinion that the groundwater contamination . . . will not have an adverse impact on the [Plaintiff] Property." *Id.* Plaintiff ultimately received the loan, did not make any further use of the 2007 Phase I Report, did not follow up on the finding that "[t]he migration of contaminated groundwater onto the site from the adjacent [Defendant] facility" constituted a REC, and did not take any steps to remain informed of what PADEP's monitoring or investigation revealed regarding the findings included in the 2004 Phase I or the 2007 Phase I. ECF No. 91-3, Dep. Tr. Mark Silvester (Day 1), at 48:20–49:5, 49:22–50:6, 51:8-14.

Defendant's Voluntary Cleanup Under Act 2

In 2008, Defendant, in conjunction with EMC, decided to perform a voluntary cleanup of soil and groundwater contamination to specific standards under the Pennsylvania Land Recycling Program, commonly referred to as "Act 2." ECF No. 91-3, Dep. Tr. Charles McGuth, at 18:9–19:5. Act 2 is a voluntary cleanup program available to property owners who have identified contamination on their properties. If a property owner can demonstrate that it has remediated the contamination to a particular standard, the Commonwealth will provide a release such that the property owner will not be required to perform additional cleanup. ECF No. 91-3, Dep. Tr. Cydney Faul-Halsor, at 15:1-9, 15:17–16:4, 22:15-20. To

12

obtain a release under Act 2, a property owner must perform an environmental investigation and follow a prescribed administrative process with PADEP. *Id.* at 20:19-25.

Throughout this process, Defendant worked with PADEP to install additional groundwater monitoring wells to adequately characterize the groundwater contamination. *Id.* at 123:20–126:3. As part of that effort, EMC, on behalf of Defendant, again sent multiple emails to Plaintiff requesting permission for Defendant to place a monitoring well on Plaintiff's property or to use the existing wells at Defendant's expense in order to analyze groundwater quality. ECF No. 91-3, Dep. Tr. Mark Silvester (Day 1), at 56:5–57:6; ECF No. 91-8, Emails, at APOLLO-EMC 2. Similar to its response to the similar request made in 2005, Plaintiff granted permission to install monitoring wells on a portion of the property that it did not believe it owned. ECF No. 91-3, Dep. Tr. Mark Silvester (Day 1), at 41:4–42:4; 57:11-23. Once Defendant installed a monitoring well in the right-of-way near Plaintiff's property, Kimmet knew about that well and he and Silvester both admit that they would have discussed the well's construction in the normal course of business, but Silvester never inquired about what the data from that monitoring well indicated until 2013. ECF No. 91-3, Dep. Tr. Bernie Kimmet, at 101:16-24; ECF No. 91-3, Dep. Tr. Mark Silvester (Day 1), at 54:18–56:2.

13

Because of a decline in market demand, Defendant operated its chromium

electroplating line only on an infrequent, as-needed basis between 2008 and 2009.

ECF No. 91-3, Decl. Michael Weal, at ¶ 6. In late 2009, Defendant decided to

discontinue chromium electroplating operations altogether. *Id.* Defendant

recovered all remaining fluids from the chromium electroplating line and retained

EMC to dismantle the line. *Id.* at ¶ 7. In early 2010, EMC dismantled and

disposed of all components of the chromium electroplating line. *Id.* Immediately

after removing the chromium line, EMC also excavated and disposed of a 50 by

20-foot portion of the concrete slab floor below the former chromium line, as well

as subsurface soil to the depth of bedrock, removing approximately 106 tons of

material altogether. *Id.* at ¶ 8. Defendant did not use chromium in any of its

operations after early 2010. *Id.* at ¶ 9.

In March of 2012, Defendant, though EMC, submitted a Remedial

Investigation and Final Report (the "Act 2 Final Report") to PADEP, detailing the

environmental investigation and remediation activities conducted at and around

Defendant's property over the preceding ten years. ECF No. 91-3, Dep. Tr.

Jonathan Jarvis, at 62:4-16; ECF No. 91-3, Decl. Michael Weal, at ¶ 10; ECF No.

91-8, Act 2 Remedial Investigation and Final Report. The Act 2 Final Report

stated that there was no active source for chromium contamination of groundwater

on Defendant's property and that any releases of chromium to groundwater were

14

historic in nature. ECF No. 91-3, Decl. Michael Weal, at ¶ 11. It also identified

only two potential sources of a historical chromium release on the Defendant

property: the disused chromium condensate basin that had been remediated by

2004 and the chrome electroplating line that had been remediated by 2010. ECF

No. 91-8, Act 2 Remedial Investigation and Final Report, at APOLLO 65-67, 74.

Based on the Act 2 Final Report and the addenda submitted by Defendant, PADEP

accepted the report and granted Defendant a release under Act 2. ECF No. 91-3,

Dep. Tr. Cydney Faul-Halsor, at 104:5; ECF No. 91-8, PADEP Act 2 Approval of

Letter.

Plaintiff Claims to Discover the Contamination

In approximately May 2012, while Plaintiff was in the process of studying

its well capacity for installation and use of a geothermal heating system, ECF No.

91-3, Dep. Tr. Mark Silvester (Day 1), at 64:6–65:3, Plaintiff contacted Sammak

about the presence of "sludge and some orange material" in an existing water well[5]

located on Plaintiff's property. ECF No. 91-3, Dep. Tr. Douglas Sammak, at

71:19; ECF No. 91-3, Dep. Tr. Mark Silvester (Day 1), at 64:21–65:2. As a result,

---

[5] There were three preexisting water wells on Plaintiff's property at this time. ECF
No. 91-3, Dep. Tr. Bernie Kimmet, at 73:6–75:2; ECF No. 91-3, Dep. Tr. Mark
Silvester (Day 2), at 57:21–58:6. Those wells, which were decades old, predated
Silvester's ownership of the property in 1988. ECF No. 91-3, Dep. Tr. Mark
Silvester (Day 2), at 58:7-9. Plaintiff's wells have not been used for any purpose
since Plaintiff acquired the property. *Id.* at 58:16-18; ECF No. 91-3, Dep. Tr.
Bernie Kimmet, at 75:6-11.

15

Sammak tested a sample of the well water for chromium, iron, and total petroleum hydrocarbons. ECF No. 91-3, Dep. Tr. Douglas Sammak, at 69:21–70:70, 71:23–73:18; ECF No. 91-3, Dep. Tr. Mark Silvester, at 65:19–66:2. Sammak testified that he tested for chromium in part because they were aware that there was "chromium contamination up-gradient [on Defendant's property], and we didn't know whether it might have something to do with chrome contamination in the water, so that's why we ran chrome." ECF No. 91-3, Dep. Tr. Douglas Sammak (Day 1), at 72:13–73:5. Nevertheless, Sammak tested only the top of the water column in the well, the "atmosphere-water interface." No groundwater was taken from deeper in the well. ECF No. 91-3, Dep. Tr. Douglas Sammak (Day 2), at 133:1–134:2. No chromium was detected in the May 2012 sample. ECF No. 91-3, Dep. Tr. Douglas Sammak (Day 1), at 74:10-12. Sammak testified that he did not believe his May 2012 chromium test was conclusive in any way about whether there was chromium contamination on Plaintiff's property. ECF No. 91-3, Dep. Tr. Douglas Sammak (Day 2), at 133:20–135:9. Plaintiff has no knowledge of whether contamination would have been present at the depth of 200 feet at which the pump test would have been performed, and no testing for chromium was done on Plaintiff's wells. *Id.* at 156:4–157:2.

Defendant's Act 2 participation required Defendant to contact Plaintiff on an annual basis to confirm that the existing water wells on Plaintiff's property

16

remained inactive. ECF No. 91-8, PADEP Act 2 Approval Letter, at pg. 304. In December 2012, EMC contacted Plaintiff on behalf of Defendant and offered to cap Plaintiff's three water wells at Defendant's expense. This offer was made so that Defendant would not need to contact Plaintiff every year to reconfirm that the wells were inactive. ECF No. 91-3, Dep. Tr. Jeremy Bolyn, at 258:2–259:9; 270:4-17; ECF No. 91-3, Dep. Tr. Mark Silvester (Day 2), at 65:14–66:9. Plaintiff rejected Defendant's request to cap the wells. ECF No. 91-3, Dep. Tr. Mark Silvester (Day 2), at 66:10-11; ECF No. 91-3, Dep. Tr. Jeremy Bolyn, at 259:7-9.

In January 2013, as Plaintiff was exploring the possibility of installing a geothermal heating system on its property in connection with a plan to convert a portion of the property into a climate-controlled self-storage facility, ECF. 99-1, Pl.'s CSOF, at ¶ 137, Plaintiff consulted with an HVAC engineer about the technical requirements for a geothermal heating system on Plaintiff's property. The engineer advised Plaintiff that the existing wells would have to be able to produce at least 360 gallons per minute in order to support a geothermal heating system sufficient for Plaintiff's property. ECF No. 91-3, Dep. Tr. Mark Silvester (Day 2), at 69:14-16; 72:21–73:5; 76:21–80:14, ECF No. 91-8, Geothermal Emails, at Atlantic 748. Sammak advised Plaintiff that it would be necessary to perform a pump test on one or more of the wells to determine whether they were capable of producing the flow needed to support a geothermal heating system, and

17

Silvester initially instructed Sammak to proceed with such a test. ECF No. 91-3, Dep. Tr. Douglas Sammak (Day 2), at 151:8–152:20; ECF No. 91-3, Dep. Tr. Mark Silvester (Day 2), at 82:2-23. However, the necessary pump test was never performed, and Plaintiff never reached any conclusion as to whether the existing wells would have been capable of supporting a geothermal heating system. ECF No. 91-3, Dep. Tr. Mark Silvester (Day 2), at 79:13-15; 84:5-6; ECF No. 91-3, Dep. Tr. Douglas Sammak (Day 2), at 156:25–157:15; 162:1-5.

Between January 2013 and March 2013, Sammak also reviewed the PADEP files and provided Plaintiff with an environmental review report that allegedly revealed to Plaintiff the existence of an environmental covenant between Defendant and PADEP, which restricted Plaintiff's use of the existing wells on its property. ECF No. 99-4, at Atlantic 214-221. Plaintiff subsequently capped one of the three water wells in order to construct a parking lot which serves as the base of a ramp used for Plaintiff's self-storage operations. ECF No. 91-3, Dep. Tr. Mark Silvester (Day 2), at 59:6–60:2. Plaintiff's well-capping was not done under the supervision of PADEP, and PADEP never directed Plaintiff to cap any of its wells. *Id.* at 66:12-17; ECF No. 91-3, Dep. Tr. Cydney Faul-Halsor, at 144:7-14. The other two remaining wells remain uncapped. ECF No. 91-3, Dep. Tr. Mark Silvester (Day 2), at 60:15-19.

18

<u>Plaintiff Files Suit and Defendant Moves for Partial Summary Judgment</u>

Plaintiff first filed suit against Defendant on October 1, 2014, in the Court of Common Pleas of Lehigh County. ECF No. 91-3, Dep. Tr. Mark Silvester (Day 1), at 70:18–71:10. Eventually Plaintiff discontinued its state court claims and initiated this federal lawsuit on November 30, 2016.

On August 16, 2017, Defendant filed a motion for partial summary judgment on Plaintiff's four common law claims (Counts V through VIII) arguing that they were time-barred. In its motion, Defendant argued that Plaintiff was on notice of potential groundwater contamination on several occasions beginning in 2004 sufficient to trigger the running of the statute of limitations and that summary judgment was proper because Plaintiff waited until 2014 to commence legal action, long after the statute of limitations had run. Plaintiff responded that summary judgment was inappropriate because a genuine issue of material fact existed as to whether Plaintiff "knew, or reasonably should have known" more than two years before it sued that it suffered an injury to its property caused by Defendant. More precisely, Plaintiff contended that it was not on notice of its alleged claims against Defendant until Defendant offered in late 2012 and early 2013 to cap its three existing wells spurring Plaintiff to have Sammak complete an environmental review, which "revealed' that Plaintiff's use of the existing wells on its property were restricted by Defendant's covenant with PADEP and that Plaintiff's

19

groundwater was in fact contaminated by chromium. The Honorable Lawrence F. Stengel denied that motion finding that based on the record that existed at the time, there were genuine issues of material fact to be decided by the jury. ECF No. 39.

## III. Legal Standard

Summary judgment "is appropriate where the moving party has established 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Burton v. Teleflex, Inc.*, 707 F.3d 417, 425 (3d Cir. 2013) (quoting Fed. R. Civ. P. 56(a)). "A fact is material if it might affect the outcome of the suit under the governing law." *Id.* When reviewing a motion for summary judgment, the court views "the facts in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor." *Id.* "[T]he non-moving party must present more than a mere scintilla of evidence" and must present evidence on which a jury could reasonably find for that party. *Id.* (internal quotation and citation omitted). Additionally, "[s]ummary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Wright v. Corning*, 679 F.3d 101, 105 (3d Cir. 2012) (internal quotation and citations omitted).

20

## IV. Discussion

### A. Plaintiff's Common Law Claims

Defendant contends that Plaintiff's common law claims, Counts V through VIII, should be dismissed because they are barred by the applicable two-year statute of limitations. ECF No. 91-1 at pp. 19-25. In response, Plaintiff argues that the law-of-the-case doctrine precludes consideration of Defendant's argument that the common law claims are barred by the statute of limitations because Defendant had previously made those arguments in its Motion for Partial Summary Judgment, ECF No. 27, which was denied, ECF No. 40. ECF No. 99 at pp. 17-22.

Contrary to Plaintiff's argument, the law-of-the-case doctrine does not preclude this Court from finding, based on the current factual record, that Plaintiff's common law claims are time-barred. As the Third Circuit has instructed, the law-of-the-case doctrine "does not limit the power of trial judges to reconsider their [own] prior decisions." *United States ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481, 493 (3d Cir. 2017) (quoting *Williams v. Runyon*, 130 F.3d 568, 573 (3d Cir. 1997)); *see also Jaroslawicz v. M&T Bank Corp.*, 912 F.3d 96, 105 (3d Cir. 2018) (stating that the district court had the power to reconsider its own interlocutory order); *Bines v. Kulaylat*, 215 F.3d 381, 384 (3d Cir. 2000) (stating that denial of summary judgment is an interlocutory order). The Third Circuit has further unequivocally stated that the transfer of a case between

21

judges, as has occurred in this case, has no bearing on that general rule. *Id.*
"Although the [law-of-the-case] doctrine provides that 'a successor judge should
not lightly overturn decisions of her predecessors in a given case,' 'it does not limit
the power of trial judges from reconsidering issues previously decided by a
predecessor judge from the same court.'" *Id.* (citing *Fagan v. City of Vineland*, 22
F.3d 1283, 1290 (3d Cir. 1994)).

Based on this well-settled law, it is clear that the law-of-the-case doctrine
does not preclude this Court from considering Defendant's argument that
Plaintiff's common law claims are barred by the statute of limitations. However,
to be clear, this Court's determination that the statute of limitations bars Plaintiff's
common law claims is not in contravention of the previous ruling in this matter
denying Defendant's Motion for Partial Summary Judgment. That previous order
was based on an analysis of the facts put before the Court at that time. Since then,
Defendant has gathered additional information which makes clear that there is no
genuine issue of material fact as to the untimeliness of Plaintiff's common law
claims.

All four of Plaintiff's common law tort claims are subject to a two-year
statute of limitations under 42 Pa. C.S. § 5524(7); *Guaranty Trust Co. of N.Y. v.
York*, 326 U.S. 99, 110 (1945) (stating that federal courts must apply state statutes
of limitation to state law claims). The statute of limitations begins to run when an

22

injury is sustained. *F.P. Woll & Co. v. Fifth & Mitchell St. Corp.*, No. 96-5973, 1999 WL 79059, at \*9 (E.D. Pa. Feb. 4, 1999) (citing *Bohus v. Beloff*, 950 F.2d 919, 924 (3d Cir.1991)). However under Pennsylvania law, there is an exception to that general rule, the discovery rule. "The discovery rule tolls the statute of limitations during the plaintiff's *complete inability*, due to facts and circumstances not within his control, to discover an injury despite the exercise of due diligence." *Blanyar v. Genova Prod. Inc.*, 861 F.3d 426, 431-432 (3d Cir. 2017) (emphasis in original) (internal quotation and citation omitted).

Thus "the statute of limitations begins to run when the plaintiff knows, or in the exercise of reasonable diligence should have known, (1) that he has been injured, and (2) that his injury has been caused by another's conduct." *Id.* at 432 (internal quotation and citation omitted). "The application of the rule requires that the plaintiff use '*all reasonable diligence* to inform himself or herself properly of the facts and circumstances upon which the right of recovery is based and to institute suit within the prescribed statutory period.'" *Id.* (emphasis in original) (quoting *Ciccarelli v. Carey Canadian Mines, Ltd.*, 757 F.2d 548, 556 (3d Cir. 1985) (citing *Schaffer v. Larzelere*, 189 A.2d 267, 269 (Pa. 1963))). Indeed, "[t]here are very few facts which cannot be discovered through the exercise of reasonable diligence . . . ." *Vernau v. Vic's Market, Inc.*, 896 F.2d 43, 46 (3d Cir. 1990) (internal quotations and citation omitted).

23

"Pennsylvania's formulation of the discovery rule reflects a narrow approach 'to determining accrual for limitations purposes' and places a greater burden upon Pennsylvania plaintiffs vis-á-vis the discovery rule than most other jurisdictions." *Blanyar*, 861 F.3d at 432 (citing *Gleason v. Borough of Moosic*, 15 A.3d 479, 484 (Pa. 2011) (quoting *Wilson v. El-Daief*, 964 A.2d 354, 364 (Pa. 2009))).

"Ultimately, 'the salient point giving rise to [the discovery rule's] application is the inability of the injured, despite the exercise of reasonable diligence, to know that he is injured and by what cause.'" *Id.* (quoting *Fine v. Checcio*, 870 A.2d 850, 858 (Pa. 2005)). "When the only reasonable conclusion from the competent evidence of record construed most favorably to the plaintiff is that the time it took for the plaintiff to file suit was unreasonable, summary judgment should be granted." *F.P. Woll & Co.*, 1999 WL 79059, at *10 (citing *Carns v. Yingling*, 279, 594 A.2d 337, 340 (Pa. Super. 1991); *MacCain v. Montgomery Hosp.*, 578 A.2d 970, 974 (Pa. Super. 1990), *appeal denied*, 592 A.2d 45 (Pa. 1991)).

Plaintiff has the burden of proving that the discovery rule applies to its claims. *Wilson*, 964 A.2d at 362. At the summary judgment stage, Plaintiff "must come forward with admissible evidence (and not simply an absence of evidence) setting forth a disputed issue of material fact that, if believed by a jury, would entitle [it] to application of the discovery rule." *Russo v. Cabot Corp.*, No. 01-2613, 2002 WL 31163610, at *2 (E.D. Pa. May 24, 2002).

Plaintiff wholly fails in its response to Defendant's motion to rebut Defendant's substantive argument that Plaintiff's common law claims are barred by the statute of limitations and instead merely relies on its blanket contention that the law-of-the-case doctrine precludes this Court from even considering Defendant's argument. Thus, Plaintiff has failed to meet its burden of establishing that it is entitled to the discovery rule and accordingly, dismissal of Plaintiff's common law claims as time-barred is appropriate.

Nevertheless, even if Plaintiff had put forth an argument that the discovery rule preserved its otherwise untimely claims, the record as set forth before this Court now is clear: Plaintiff knew about its alleged injuries in as late as 2007, and Plaintiff knew those alleged injuries were caused by Defendant. The new discovery put forth by Defendant here removes any doubt as to whether Plaintiff was undeniably aware in at least 2007 that its groundwater was contaminated and that the contamination had flown from Defendant's property at some point. In particular, the deposition testimony of Plaintiff's site manager and environmental consultant establishes that Plaintiff's owner had discussions with them both in 2005 about Defendant's request to place a groundwater monitoring well on Plaintiff's property and that he rejected that request because he "didn't want to get involved in anything that had to do with environmental issues on his property." ECF No. 91-2, SOF at ¶¶ 68-70.

In addition, it has since come to light that when Plaintiff tested well water for chromium in 2012 and the results were negative, Plaintiff only sampled the water at the surface of the well, not at any depth, which Plaintiff's environmental consultant admits was not an effective or accurate method for testing for chromium. ECF No. 91-2, SOF at ¶¶ 125-130. This new evidence makes clear that Plaintiff willfully chose to remain ignorant of environmental conditions on its property—specifically in 2004 and 2007 when Plaintiff was made aware in writing from its own environmental consultant that there was groundwater contamination flowing from up-gradient Defendant, every time Defendant requested to place monitoring wells on Plaintiff's property, and then in 2012 when superficial tests were completed to test for a contamination it knew was present for nearly a decade—rather than undertake the necessary investigation required by law to preserve an otherwise untimely claim under the discovery rule.

In light of the new evidence, any doubt that Plaintiff had a duty to further investigate the groundwater contamination in order to preserve its potential claims even though the 2004 and 2007 Phase I Reports stated that "[b]ased on the fact that the source of groundwater contamination in the area has been identified, public water is available in the area, and that the PA DEP has established oversight of the open cases, it is AA&E's opinion that the groundwater contamination associated with these properties will not have an adverse impact on [Plaintiff's property]" is

26

eliminated. "A claim accrues when the plaintiff is damaged, not when the amount or extent of damages is determined." *F.P. Woll & Co.*, 1999 WL 79059, at *10 (citing *Liberty Bank v. Ruder*, 587 A.2d 761, 765 (Pa. Super. 1991); *Pashak v. Barish*, 450 A.2d 67, 69 (Pa. Super. 1982)). Further, "[t]hat a plaintiff does not know the precise extent of his injury will not stop the running of the limitations period." *F.P. Woll & Co.*, 1999 WL 79059, at *10 (citing S*terling v. St. Michael's School*, 660 A.2d 64, 65 (Pa. Super.), *appeal denied*, 670 A.2d 142 (Pa. 1995); *Bradley v. Ragheb*, 633 A.2d 192, 196 (Pa. Super. 1993), *appeal denied*, 540 Pa. 627, 658 A.2d 791 (Pa.1994)). To accept that the statute of limitations did not begin to run on this record until 2012 would effectively render the statute of limitations a nullity.

Plaintiff's attempt to rescue its trespass claim from the statute of limitations by arguing that Defendant's alleged failure to adequately remedy the purported contamination constitutes a continuing trespass is unavailing. The Third Circuit has made clear that groundwater contamination does not qualify as a continuing trespass. *See F.P. Woll & Co. v. Fifth & Mitchell St. Corp.*, 326 F. App'x 658, 662 (3d Cir. 2009) (classifying soil and groundwater contamination as a permanent change rather than a continuing trespass) (citing *Dombrowski v. Gould Elecs., Inc.*, 954 F. Supp. 1006, 1013 (M.D. Pa. 1996)).

27

Because Plaintiff knew of its alleged injuries and that they were caused by Defendant here likely in 2004 but definitely by 2007, Plaintiff's common law claims are time-barred and will be dismissed accordingly.

B.    Statutory Claims

1.    *Comprehensive Environmental Response, Compensation, and Liability ("CERCLA") Claim (Count I)*

Defendant contends that Plaintiff's claim for cost recovery under Section 107 of CERCLA fails because Plaintiff cannot establish that it has incurred "response costs" at its property that were "necessary and consistent" with the National Oil and Hazardous Contingency Plan ("NCP") under 42 U.S.C. § 9607. To prove its claim for response costs under CERCLA, Plaintiff must establish the following four elements: (1) Defendant is a facility within the meaning of CERCLA; (2) there has been a release or threatened release of a hazardous substance from the facility; (3) the release or threatened release has required Plaintiff to incur response costs; and (4) Defendant is a potentially responsible party under CERCLA. *U.S. Virgin Islands Dep't of Planning & Nat. Res. v. St. Croix Renaissance Grp., L.L.L.P.*, 527 F. App'x 212-214 (3d Cir. 2013) (citing 42 U.S.C. § 9607(a); *United States v. Alcan Aluminum*, 964 F.2d 252, 258-259 (3d Cir. 1992)). The only disputed issue here is whether Plaintiff incurred response costs that were necessary and consistent with the NCP. ECF No. 91-1 at pg. 41.

28

Specifically, Defendant contends that Plaintiff has failed to establish (1) that any of the alleged response costs were "necessary," and (2) that Plaintiff has substantially complied with the applicable requirements of the NCP. *Id.* Plaintiff's alleged "response costs" include the "expenses associated with closing wells on its property that DEP said it could not use, as well as costs related to testing of groundwater, investigative and laboratory expenses in order to determine the true extent of contamination flowing from an upgradient source, namely the [Defendant's] property, and costs associated with obtaining professional consulting and legal advice regarding remediation and potential liability." ECF No. 99 at pp. 44-54. Defendant contends that Plaintiff incurred all of its purported response costs "voluntarily and for business or litigation reasons, and not to address any hazardous release." ECF No. 91-1 at pg. 42.

The record supports Defendant's conclusion that it is essentially undisputed that all of Plaintiff's so-called "response costs" were not undertaken by Plaintiff to contain or clean up the alleged hazardous contamination purportedly stemming from Defendant's property. "Response costs," as defined by the statute, are "directed at containing and cleaning up hazardous releases . . . . Therefore, necessary costs of response must be necessary to the containment and cleanup of hazardous releases." *Redland Soccer Club, Inc. v. Dep't of Army of U.S.*, 55 F.3d 827, 850 (3d Cir. 1995) (quotations and citations omitted). It is undisputed that

29

Plaintiff has only capped one of the three wells on its property and that it capped that well as part of its constructing a self-storage facility on the property complete with a parking lot. ECF No. 91-2, SOF at ¶¶ 148-150; ECF No. 99-1, CSOF at ¶¶ 148-150. It is further undisputed that Plaintiff was not directed to cap that well by PADEP or that it was ultimately capped under the supervision of PADEP. ECF No. 91-2, SOF at ¶¶ 151-152; ECF No. 99-1, CSOF at ¶¶ 151-152. Other than the one test of surface water in 2012 completed by Sammak, Plaintiff has never even tested its water wells for contamination. ECF No. 91-2, SOF at ¶ 146; ECF No. 99-1, CSOF at ¶ 146. Thus, the capping of the well, which notably Defendant previously offered to cap, along with the other two remaining wells at its own expense, cannot be said to be a response cost as defined by the statute.

Further, Plaintiff tellingly fails to adequately rebut Defendant's argument that the remaining alleged "response costs" are actually business and litigation expenses rather than cleanup and containment costs. Plaintiff's hiring of Sammak in 2013 was related to Plaintiff's exploring the possibility of installing a geothermal heating system on the property and the remaining work he and other environmental consultants might have undergone around that time were litigation expenses undertaken in preparation for and in development of Plaintiff's state and subsequent federal suits.

As Plaintiff cannot establish that it has incurred "response costs" at its property, the Court need not consider whether those alleged costs were consistent with the NCP. Accordingly, the Court will grant summary judgment in favor of Defendant as to Plaintiff's CERCLA claim, Count I.

    2.   *Hazardous Sites Cleanup Act ("HSCA") Claim (Count III)*

Similar to Defendant's CERCLA argument, Defendant contends that Plaintiff's HSCA claim fails because the alleged response costs are not "reasonable and necessary" within the meaning of the statute. It is well established that HSCA's cost recovery and contribution provisions are "virtually identical to those in CERCLA." *Trinity Indus., Inc. v. Chicago Bridge & Iron Co.*, 735 F.3d 131, 137 (3d Cir. 2013) (citing *Agere Sys., Inc. v. Advanced Envtl. Tech. Corp.*, 602 F.3d 204, 236 (3d Cir. 2010)). Thus, the HSCA permits a private plaintiff to recover only "reasonable and necessary or appropriate response costs," and like CERCLA, does not authorize a plaintiff to recover compensatory damages or economic losses. *See F.P. Woll & Co. v. Fifth and Mitchell Street Corp.*, No. 96-5973, 2005 WL 1592948, at *3 (E.D. Pa. July 1, 2005). The HSCA defines "response" as any "[a]ction taken in the event of a release or threatened release of a hazardous substance or a contaminant into the environment to study, assess, prevent, minimize or eliminate the release in order to protect the present or future public health, safety or welfare or the environment." 35 P.S. § 6020.103.

31

Accordingly, for the same reasons Plaintiff's CERCLA claim fails as a matter of law as previously set forth, Plaintiff's HSCA claim, Count III, shall also be dismissed.

### 3. *Resource Conservation and Recovery Act ("RCRA") Claim (Count II)*

Defendant contends that summary judgment should be granted as to

Plaintiff's RCRA claim because Plaintiff cannot prove any imminent and

substantial danger to human health or environment. ECF No. 91-1 at pp. 47-51.

The RCRA Citizen Suit provision states in relevant part as follows:

(a) In general.

Except as provided in subsection (b) or (c) of this section, any person may commence a civil action on his own behalf--

(1)(B) against any person, including the United States and any other governmental instrumentality or agency, to the extent permitted by the eleventh amendment to the Constitution, and including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment

42 U.S.C. § 6972(a)(1)(B). To prevail on a claim under § 6972(a)(1)(B), a plaintiff

must prove "(1) that the defendant is a person, including, but not limited to, one

who was or is a generator or transporter of solid or hazardous waste or one who

was or is an owner or operator of a solid or hazardous waste treatment, storage, or

disposal facility; (2) that the defendant has contributed to or is contributing to the

32

handling, storage, treatment, transportation, or disposal of solid or hazardous

waste; and (3) that the solid or hazardous waste may present an imminent and

substantial endangerment to health or the environment." *Tri-Realty Co. v. Ursinus*

*Coll.*, 124 F. Supp. 3d 418, 439 (E.D. Pa. 2015) (citing *Interfaith Cmty. Org. v.*

*Honeywell International, Inc.*, 399 F.3d 248, 258 (3d Cir. 2005)). As Defendant

acknowledges, with respect to that critical phrase from the RCRA statute, "may

present an imminent and substantial endangerment to health or the environment,"

the Third Circuit has explained the meaning of this statutory language as follows:

> The operative word...[is] "may"....

> [P]laintiffs need only demonstrate that the waste..."may present" an imminent and substantial threat.... Similarly, the term "endangerment" means a threatened or potential harm, and does not require proof of actual harm.... The endangerment must also be "imminent" [meaning] threatens to occur immediately.... Because the operative word is "may," however, the plaintiffs must [only] show that there is a potential for an imminent threat of serious harm...[as] an endangerment is substantial if it is "serious"...to the environment or health.

*Interfaith Cmty. Org.*, 399 F.3d at 258 (citations and internal quotations omitted).

"The RCRA standard thus builds in two layers of probability that may result

in liability: anything that may *present* (but not necessarily *has* presented) a *threat*

of immediate and serious harm (but not necessarily *actual* harm) is actionable

under RCRA." *Tri-Realty Co.*, 124 F. Supp. 3d at 442 (citation omitted) (emphasis

in original). "However, injunctive relief is inappropriate where the risk of harm is

33

remote in time, completely speculative in nature, or *de minimis* in degree." *Id.* (citations and quotations omitted).

Plaintiff here seeks "a mandatory injunction requiring Defendant[] to take necessary action to sufficiently and effectively abate the presence of hexavalent chromium and TCE in Plaintiff's groundwater resource." ECF No. 1 at ¶ 51. The Third Circuit has recognized in the RCRA context that "a mandatory injunction is an extraordinary remedy that is only granted sparingly by the courts." *Trinity Indus., Inc.*, 735 F.3d at 139 (citations omitted). "[W]hen mandatory injunctive relief is sought, the burden on the moving party is particularly heavy." *Id.* (citations and internal quotations omitted). "Indeed, the moving party's right to relief must be indisputably clear." *Id.* (citations and internal quotations omitted).

Defendant contends that Plaintiff cannot put forth any affirmative evidence that groundwater contamination below Plaintiff's property presents an "imminent and substantial" endangerment to human health or the environment. ECF No. 91-1 at pp. 47-51. "[A]lthough courts consider the totality of the circumstances when evaluating a RCRA claim, evidence regarding the likelihood and degree of human and/or environmental exposure to contamination, along with the risks associated with such exposure, is most likely to assist courts in making endangerment determinations under RCRA." *Tri-Realty Co.*, 124 F. Supp. 3d at 444. Other than asserting that the contamination plume is greater than that confirmed by PADEP,

34

Plaintiff asserts that PADEP's requiring Defendant to annually contact Plaintiff in order to ensure that none of the wells on Plaintiff's property are being used is "evidence that the contaminated groundwater in those wells may pose an imminent and substantial endangerment under RCRA." ECF No. 99 at pg. 50. To survive summary judgment, Plaintiff must present non-speculative evidence of a potential exposure pathway that may present an imminent and substantial endangerment to health or the environment. *Tri-Realty Co.*, 124 F. Supp. 3d at 445. The only potential exposure pathway identified by Plaintiff here is the exact pathway Plaintiff has repeatedly refused to allow Defendant to eliminate at absolutely no cost to Plaintiff: the two remaining water wells on Plaintiff's property. As PADEP found, the water wells are only dangerous to health or the environment if the wells are used for drinking water, which Plaintiff does not intend to do and which could be further eliminated as a possibility if Plaintiff allowed Defendant to cap them as has been previously offered. Accordingly, the Court finds Plaintiff has failed to meet its heavy burden here and the RCRA claim, Count II, fails as a matter of law.

### 4. *Plaintiff's Clean Streams Law ("CSL") Claim (Count IV)*

The CSL allows a private party to "commence a civil action . . . against any other person alleged to be in violation of any provision of this act or any rule, regulation, order or permit issued pursuant to this act." 35 P.S. § 691.601(c).

Injunctive relief is the only remedy available to a private plaintiff under the CSL, 35 P.S. § 691.601(c), and Pennsylvania courts have interpreted Section 691.601(c) to require a current, ongoing violation of the CSL. *PennEnvironment v. PPG Indus., Inc.*, 964 F. Supp. 2d 429 (M.D. Pa. 2013). Similar to its RCRA claim, Plaintiff here seeks an order from this Court "requiring Defendant[] to take necessary action to sufficiently and effectively abate the presence of those industrial wastes and pollutants in [Plaintiff]'s groundwater resource." ECF No. 1 at ¶ 70.

As Defendant contends, Plaintiff cannot present evidence of Defendant's ongoing violation or threatened violation of the CSL. The Act 2 Final Report identifies only two potential sources of chromium attributable to Defendant: the disused chromium condensate basin and the chrome electroplating line removed in 2010. ECF No. 91-2, SOF at ¶ 120. Both of these potential sources were eliminated before this action was filed in 2016 and also before Plaintiff first sued Defendant in state court in 2014. Defendant hired EMC to remove the contents of the condensate basin, the condensate basin, and 30 tons of soil surrounding the basin, and EMC completed the removal and remediation of the basin in 2004. *Id.* at ¶¶ 50-53. Similarly, EMC removed the chrome line in 2010. *Id.* at ¶ 42. EMC removed all the fluids from the line, removed and disposed of the line, and

removed the concrete slab floor and subsurface soil beneath the line. *Id*. at ¶¶ 110-112.

Plaintiff seemingly concedes that it cannot identify evidence of any new or threatened release of contamination by focusing in its response on Defendant's admission in the Act 2 Final Report that contaminants are likely present within bedrock unreachable by Defendant during its cleanup that "represent an ongoing source of contaminant influx into groundwater." ECF No. 99 at pg. 52. This purported admission though pertains to the historical contamination on Defendant's property, not a new source of contamination as required to state a claim under the CSL. Further, Defendant is relieved from the possibility of liability as to this claim because Defendant's Act 2 release precludes citizen suits under the CSL for any remaining contamination that was considered and addressed through the Act 2 remediation process. 35 P.S. §§ 6026.106, 6026.501 ("Any person demonstrating compliance with the environmental remediation standards established in Chapter 3 shall be relieved of further liability for the remediation of the site under [the CSL and other statutes] for any contamination identified in reports submitted to and approved by the department to demonstrate compliance with these standards and shall not be subject to citizen suits or other contribution actions brought by responsible parties."). Defendant's 2012 Remedial Investigation and Final Report noted that contaminants of concern remained in the

37

bedrock. ECF No. 91-8, Remedial Investigation and Final Report, at Apollo

000077. Accordingly, Plaintiff's CSL claim, Count IV, will be dismissed.

## V.    Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment will

be granted. An appropriate Order follows.


DATED: ___4 - 10 - 2019___          BY THE COURT:

_____

CHAD F. KENNEY, J.